# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DANIEL AND NATALIE DIEDRICH,**

    Plaintiffs,

    v.                                                Case No. 13-CV-693

**OCWEN LOAN SERVICING, LLC,**

    Defendant.

## DECISION AND ORDER ON PLAINTIFFS' AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

Daniel and Natalie Diedrich ("the Diedrichs"), filed a complaint against Ocwen Loan Servicing, LLC ("Ocwen"), alleging various claims arising from a loan modification agreement entered into between the Diedrichs and Ocwen. Specifically, in their amended complaint, the Diedrichs alleged violations of Wis. Stat. § 138.052(7), Wis. Stat. § 138.052(7s)(a), 12 U.S.C. § 2605(e)(1), (2), and Wis. Stat. § 224.77(1)(k), (L), and (m). In a decision issued December 3, 2013, Magistrate Judge Callahan granted in part Ocwen's motion to dismiss and dismissed the Diedrichs' claims pursuant to Wis. Stat. § 138.052(7s)(a) and 12 U.S.C. § 2605(e)(1). (Docket # 21.)

This case was subsequently reassigned to me and the parties again consented to magistrate judge jurisdiction. Both parties move for summary judgment in their favor on all remaining counts of the Diedrichs' amended complaint. For the reasons that I explain in this decision, the Diedrichs' motion for summary judgment is denied and Ocwen's motion for summary judgment is granted.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

**UNDISPUTED FACTS**

On February 20, 2007, Natalie Diedrich and Daniel Diedrich executed a Note to Decision One Mortgage Company in the amount of $184,800. (Pls.' Resp. to Def.'s Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 48.) To secure the Note, the Diedrichs executed a mortgage dated February 20, 2007, that was recorded on February 27, 2007 at the Calumet County Register of Deeds as Document Number 414527. (*Id.* ¶ 2.) Ocwen is now the servicer of the Diedrichs' loan. (*Id.* ¶ 3.) Although the Diedrichs dispute that they defaulted under the terms and conditions of the Note and mortgage, they agree that Ocwen began foreclosure proceedings in Calumet County on September 28, 2010. (*Id.* ¶ 4.) Ocwen and the Diedrichs entered into a loan modification agreement dated May 20, 2011, implemented beginning July 1, 2011. (*Id.* ¶ 5.) As a result, the Calumet County foreclosure case was dismissed. (*Id.* ¶ 6.)

The Diedrichs began to make payments pursuant to the loan modification agreement. (Def.'s Resp. to Pls.' Proposed Findings of Fact ("PPFOF") ¶ 8, Docket # 51.) In July 2013, the Diedrichs became concerned about whether their escrow account was being correctly administered. (*Id.* ¶ 9.) The Diedrichs also became concerned that they were being charged improper litigation fees. (*Id.* ¶ 10.) Ocwen paid litigation charges from the suspense account on the file and the litigation charges paid by Ocwen on the suspense account exactly matched the amounts that had been charged to the Diedrichs on their bills. (*Id.* ¶¶ 14-15.)

The original note signed by the Diedrichs set an interest at a rate of 9.64% when it was signed in February 2007. (*Id.* ¶ 17.) The loan modification agreement specified that the Diedrichs would pay an interest rate of 2.0% on Ocwen's loan beginning at the end of the

trial period until July 1, 2016, at which point the interest rate would increase to 4.5% for the remainder of the loan. (*Id.* ¶ 19.) The Diedrichs' billing statements from July 2011 through February 2012 reflect the 2.0% interest rate. (Pls.' Resp. to DPFOF ¶ 8.)

In February 2012, Ocwen received a letter from the Diedrichs' attorney requesting loan information. (*Id.* ¶ 9.) On February 22, 2012, Ocwen acknowledged receipt of the February 2012 letter from the Diedrichs' attorney and provided the information requested. (*Id.* ¶ 10.) On February 24, 2012, Ocwen also sent a Payment Reconciliation in response to the February 2012 letter from the Diedrichs' attorney. (*Id.* ¶ 11.) On March 6, 2013, Ocwen received a letter from the borrowers dated February 22, 2013 requesting information regarding the loan. (*Id.* ¶ 12.) The Diedrichs sent the February 22, 2013 letter at the direction of their attorney. (*Id.* ¶ 14.)

On or around February 25, 2013, the Diedrichs sent Ocwen a borrower information request. (Def.'s Resp. to PPFOF ¶ 25.) In the borrower information request, the Diedrichs requested eight types of standard information about their account, including the names of the employees working on their account, the history of payments made from their escrow account including the date, amount, and payee, and a statement of interest rates applied to their account, among other general inquiries about their account information. (*Id.* ¶ 26.)

On or around March 7, 2013, Ocwen wrote a form letter to the Diedrichs, which simply said what Ocwen's policies were with respect to their inquiries. (*Id.* ¶ 31.) On or around March 30, 2013, Ocwen wrote to the Diedrichs stating that it would take another 15 days to review the Diedrichs' inquiry. (*Id.* ¶ 32.) In a letter dated April 22, 2013, Ocwen wrote the Diedrichs a letter saying only that it could not identify a problem with their account, and indicated that the Diedrichs should send another letter identifying which

month and reporting was being disputed, the explanations for the dispute, and all evidence showing that the payment for that month was received on time or that the information they reported was incorrect. (*Id.* ¶ 33.) Ocwen sent the Diedrichs' letter to its Research Department. (*Id.* ¶ 38.)

## ANALYSIS

Both parties move for summary judgment in their favor. The Diedrichs move for summary judgment as to liability on their 12 U.S.C. § 2605(e)(2) claim and on their Wis. Stat. § 224.77(1) claim. Ocwen moves for summary judgment on all of the surviving claims in the Diedrichs' amended complaint, pursuant to Wis. Stat. § 138.052(7), 12 U.S.C. § 2605(e)(2), and Wis. Stat. § 224.77(1). I will address each claim in turn.

1. *Wis. Stat. § 138.052(7) Claim*

Wis. Stat. § 138.052(7) states that "[i]nterest imposed on the amount due after acceleration or maturity of a loan may not exceed the contract rate." Ocwen argues that it is entitled to summary judgment on the Diedrichs' Wis. Stat. § 138.052(7) claim because it only charged the Diedrichs the contractual interest rate. There is no dispute that the loan modification agreement specified that the Diedrichs would pay an interest rate of 2.0% on Ocwen's loan beginning at the end of the trial period until July 1, 2016, at which point the interest rate would increase to 4.5% for the remainder of the loan. (Def.'s Resp. to PPFOF ¶ 19.) The parties do dispute, however, what dates the "trial period" encompasses. The Diedrichs argue that the trial period lasted from May 30, 2011 until July 1, 2011 (PPFOF ¶ 18), whereas Ocwen states that the one month trial period began on July 1, 2011 (Def.'s Resp. to PPFOF ¶ 18). The loan modification agreement states that "In order for the terms of this modification to become effective, you promise to make an initial payment of $952.71

5

on or before 5/30/11 and one (1) equal monthly payment of principal and interest in the amount of $640.98 to Ocwen ("Trial Period") beginning on 7/1/11." (Oct. 1, 2014 Declaration of Christina E. Demakopoulos, ¶ 4, Exh. T, Deposition of Natalie Diedrich ("Natalie Diedrich Dep."), Exh. 1 at 25, Docket # 44-3.)

The original note signed by the Diedrichs set interest at a rate of 9.64% when it was signed in February 2007. (Def.'s Resp. to PPFOF ¶ 17.) Ocwen argues that the July 2011 payment was a "trial payment" and the loan modification provided that the loan would be modified to the terms specified after the trial payment was made. Thus, pursuant to the terms of the agreement, the interest rate would change after the trial payment was made, so there is no evidence that any interest rate was used to calculate the trial payment. (Def.'s Resp. Br. at 2, Docket # 50.) Further, Ocwen argues that paragraph one of the loan modification indicates that the July 1, 2011 payment would be equal to one month of principal and interest in the amount of $640.98, which is equal to the 2.0% principal and interest loan modification payment. (*Id.*) The Diedrichs argue that either they were charged 9.64% from July 1, 2011 through August 1, 2011, or that it was unclear what interest rate was charged during this time period. (Pl.'s Resp. Br. at 1-3, Docket # 45.)

In support of their contention that Ocwen charged them interest that exceeded the contract rate of 2.0%, the Diedrichs point to a July 26, 2011 printout from Ocwen's website that indicated that on September 28, 2011, their interest rate would become 9.64%. (Oct. 22, 2014 Declaration of Christina E. Demakopoulos ("Oct. 22, 2014 Demakopoulos Decl."), ¶ 3, Exh. V, Natalie Diedrich Dep., Exh. 18, Docket # 55-2.)

The Diedrichs also argue that Exhibit 3 to the deposition of Rashad Blanchard, a loan analyst with Ocwen, shows that a 9.64% interest rate was charged from July 1, 2011

6

until August 1, 2011. (Docket # 45 at 2.) Additionally, Natalie Diedrich also testified that she received a letter from Ocwen on July 5, 2011 that indicated that her interest rate was going to increase to 9.64%. (Natalie Diedrich Dep. at 11, 35-36, Docket # 44-3 at 4, 10.)[1]

To begin, the Diedrichs only challenge the interest rate charged in July 2011 (Docket # 45 at 1-2) thus, it is unclear how the July 26, 2011 printout indicating a September 28, 2011 change advances their argument. Next, Exhibit 3 to the Blanchard Deposition is confusing and more to the point, unhelpful as to the interest rate charged in July 2011. It shows a computer printout listing several "pending change date[s]" and "new interest rate[s]" on the Diedrichs' loan modification. (Declaration of Briane F. Pagel ("Pagel Decl.") ¶ 2, June 26, 2014 Deposition of Rashad Blanchard ("June 26, 2014 Blanchard Dep."), Exh. 3, Docket # 37-2 at 52.) The first date listed is March 28, 2011, which shows an interest rate of 9.64% and the next date listed is August 1, 2011, which shows an interest rate of 2%. (*Id.*) The August 1, 2011 entry shows a "change in interest rate" of 7.64%. (*Id.*) The next "pending change date" shown is September 1, 2011, then September 1, 2012, then August 1, 2013, and finally March 1, 2014. (*Id.*) Each of these entries show a 2% interest rate and a "change in interest rate" of 0%. (*Id.*)

Blanchard's testimony shed very little light, if any, on the meaning of Exhibit 3. He testified that this document showed what the interest rate was supposed to be on those given days. (June 26, 2014 Blanchard Dep. at 10-15, Docket # 37-1 at 4-5.) He also agreed with the statement that the document showed the "interest rate being applied to the loan as of those dates on the listing." (*Id.* at 13, Docket # 37-1 at 5.)

---

[1] It should be noted that neither party references this July 5, 2011 letter in their summary judgment submissions, nor has either party produced a copy of this letter.

Accordingly, neither Blanchard's testimony nor Exhibit 3 show that the Diedrichs were charged a 9.64% interest rate between July 1 and August 1, 2011 as the Diedrichs contend. Moreover, despite receiving the July 5, 2011 letter stating that their interest rate was going to increase and the computer printout showing a September 2011 increase, the record evidence shows that the Diedrichs were in fact only charged the correct interest rate—2.0%—from July 1, 2011 onward. Kevin Flannigan, senior loan analyst for Ocwen, averred that since the implementation of the loan modification (beginning July 1, 2011), only a 2.0% interest rate was applied to the account. (Affidavit of Kevin Flannigan ¶¶ 8-9, Exhs. D and E, Docket # 42, 42-4, 42-5.) This is consistent with Blanchard's testimony that the interest rate on the Diedrichs' loan has been 2.0% since the loan modification in July 2011. (Oct. 22, 2014 Demakopoulous Decl., ¶ 2, Exh. U, May 28, 2014 Deposition of Rashad Blanchard at 55, Docket # 55-1 at 15.) Natalie Diedrich testified that her account statements from July 2011 through February 2012 reflected the 2.0% interest rate. (Pls.' Resp. to DPFOF ¶ 8; Natalie Diedrich Dep. at 11-14, Docket # 44-3 at 4-5.) Indeed, Exhibit 2 to Natalie Diedrich's deposition, the July 20, 2011 statement, shows an interest rate of 2%. (Natalie Diedrich Dep., Exh. 2, Docket # 44-3 at 28.) Also, although Natalie Diedrich was not "a hundred percent sure" if her principal and interest payment changed at any point, she could not remember seeing an account statement reflecting an interest rate higher than 2.0%. (Natalie Diedrich Dep. at 15-16, Docket # 44-3 at 5.)

In the end, while Ocwen could not explain why the computer printout seemed to indicate that the Diedrichs' interest payment was going to increase on September 28, 2011, there is no evidence to show that the interest rate actually increased. Thus, even assuming that the Diedrichs are correct that the trial period lasted from May 30, 2011 until July 1,

2011 and that the 2.0% interest rate started as of July 1, 2011, the evidence does not show that they were charged interest greater than 2.0% as of July 1, 2011. Ocwen is granted summary judgment on the Diedrichs' Wis. Stat. § 138.052(7) claim.

*2. RESPA Claim*

The Diedrichs argue that they are entitled to summary judgment as to liability on their claim that Ocwen violated § 2605(e)(2) of the Real Estate Settlement Practices Act ("RESPA") by failing to respond to their inquiries regarding their loan modification. Ocwen argues that it did not, as a matter of law, violate RESPA, and even if it did, the Diedrichs have failed to establish damages.

RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans. *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). The statute imposes a number of duties on lenders and loan servicers. *Id.* This includes the duties of a loan servicer to respond promptly to a borrower's written request for information. *See* 12 U.S.C. § 2605(e). A "qualified written request" will trigger a loan servicer's duties under RESPA to acknowledge and respond. *Id.* The statute defines a qualified written request as "written correspondence (other than notices on a payment coupon or similar documents) from the borrower or her agent that requests information or states reasons for the borrower's belief that the account is in error." *Catalan*, 629 F.3d at 680; 12 U.S.C. § 2605(e)(1)(B). To qualify, the written request must also include the name and account of the borrower or must enable the servicer to identify them. *Id.*

Within 30 days after receiving a qualified written request, the servicer must take one of three actions: either (1) make appropriate corrections to the borrower's account and

notify the borrower in writing of the corrections; (2) investigate the borrower's account and provide the borrower with a written clarification as to why the servicer believes the borrower's account to be correct; or (3) investigate the borrower's account and either provide the requested information or provide an explanation as to why the requested information is unavailable. *Catalan*, 629 F.3d at 680; 12 U.S.C. § 2605(e)(2)(A), (B), and (C). No matter which action the servicer takes, the servicer must provide a name and telephone number of a representative of the servicer who can assist the borrower. *See id.*

### 2.1 Qualified Written Request

The parties dispute whether the Diedrichs' letter dated February 22, 2013 is a qualified written request under the statute. To be a qualified written request, "a written correspondence must reasonably identify the borrower and account and must 'include a statement of the reasons for the belief of the borrower, *to the extent applicable*, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.'" *Catalan*, 629 F.3d at 687 (quoting 12 U.S.C. § 2605(e)(1)(B)) (emphasis in original). The Seventh Circuit has made clear that "[a]ny reasonably stated written request for account information can be a qualified written request." *Id.* The February 22, 2013 letter is unequivocally a qualified written request under RESPA. The correspondence identifies the names and address of the Diedrichs and lists their account number. (Natalie Diedrich Dep., Exh. 17, Docket # 44-3 at 50-51.) The letter states the Diedrichs' belief that Ocwen applied the incorrect interest rate to their account on and after July 2011, over-escrowed the account, and improperly charged litigation fees. (*Id.*) The letter then specifically requests information regarding their account, including amounts escrowed and interest rates charged. (*Id.*) The Diedrichs were clearly requesting information and

stating a belief that their account was in error. Thus, the February 22, 2013 correspondence was a qualified written request and triggered a duty by Ocwen to respond.

      2.2     Ocwen's Response

The parties also dispute whether the response Ocwen provided was sufficient under RESPA. Ocwen sent several responses to the Diedrichs' request, dated March 7, 2013, March 30, 2013, and April 22, 2013. (Natalie Diedrich Dep., Exhs. 19-21, Docket # 44-3 at 52-54.) The March 7, 2013, correspondence acknowledged the Diedrichs' request and stated a response would be provided within twenty days. (Natalie Diedrich Dep., Exh. 19, Docket # 44-3 at 52.) The March 30, 2013 correspondence stated that Ocwen was unable to respond within twenty days but acknowledged a response would be provided within the deadlines provided by RESPA. (Natalie Diedrich Dep., Exh. 20, Docket # 44-3 at 53.) The April 22, 2013 correspondence stated that Ocwen was "unable to identify your specific dispute from the inquiry" and stated that "[i]n the event you think that Ocwen had made an error in the credit reporting of your loan," to send additional information. (Natalie Diedrich Dep., Exh. 21, Docket # 44-3 at 54.) Ocwen stated that "[w]ithout this information, [Ocwen] will be unable to proceed with [its] research as it relates to the loan." (*Id.*) The letter also directed the Diedrichs to its Customer Care Centre, and provided the phone number for further inquiries. (*Id.*)

Ocwen argues that the April 22, 2013 letter complies with 12 U.S.C. § 2605(e)(2)(C) because it investigated the Diedrichs' account and provided an explanation as to why the requested information was unavailable. I find that Ocwen's April 22, 2013 was insufficient to satisfy the requirements of § 2605(e)(2)(C). The Diedrichs' February 22, 2013 letter clearly informed Ocwen that they believed their account was in error regarding the interest

rate charged, the amount escrowed, and litigation fees charges. The Diedrichs also requested specific information, such as identification of the payees and amounts disbursed from the account and the current interest rate being charged. A reasonable person reading this letter would conclude that the Diedrichs had complaints regarding the interest rate applied, the amount escrowed, and the litigation fees charged. Thus, it is unclear why Ocwen had difficulty identifying the specific dispute. Further, the Diedrichs' letter does not dispute the credit reporting of their loan; therefore, it is unclear why Ocwen would request additional information regarding credit reporting of the loan or why Ocwen would need this additional information in order to respond to the Diedrichs' request.

Also, there is no evidence in the record that Ocwen conducted an investigation into the Diedrichs' inquiries. The plain language of the April 22, 2013 correspondence indicates that Ocwen would not proceed with its research until it received the information regarding the credit reporting of the loan. I find the court's holding in *Holland v. GMAC Mortgage Corp*. No. 03-2666, 2006 WL 1133224 (D. Kan. Apr. 26, 2006), persuasive. In *Holland*, the plaintiff sent a written request outlining a variety of concerns, including his belief that the defendant was not posting his checks in a timely manner. *Id.* at 8. The defendant responded by requesting that the plaintiff send a copy of the front and back of the actual canceled check or checks in question and stated that "[u]ntil we receive a copy of the front and back of the missing check/s, we cannot research the issue any further." *Id.* at *9. The court found the defendant's response insufficient under § 2605(e)(2)(C) because the defendant failed to conduct an investigation before responding to the inquiry. *Id.* Specifically, the court found that even though the defendant claimed that it could not conduct an investigation without the requested information, the defendant could have conducted a limited investigation using

12

the information it had at the time. *Id*. The court noted that "it would be contradictory to the purpose of RESPA to allow defendant to avoid liability by placing its burden of investigating [the plaintiff's] inquires back on him." *Id.*

Here, it is unclear why Ocwen could not conduct an investigation into the Diedrichs' inquiries without information on accurate credit reporting when the Diedrichs were not questioning this. As such, Ocwen's letter was insufficient under § 2605(e)(2)(C) because it was unresponsive to any of the Diedrichs' clear requests for information and failed to give a sufficient reason as to why the information requested was unavailable or could not be obtained.

      2.3     Damages

Ocwen argues that even if the Diedrichs can show a violation of RESPA, their RESPA claim cannot survive because they do not have competent evidence of damages. Plaintiffs "must come forward with evidence sufficient to support an award of actual damages to pursue their RESPA . . . claims." *See Catalan*, 629 F.3d at 693. RESPA allows for damages in an amount equal to the sum of: (A) any actual damages to the borrower as a result of the failure; and (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000. 12 U.S.C. § 2605(f)(1). Although the Diedrichs alleged in their amended complaint that Ocwen engaged in a "pattern or practice" of noncompliance, the Diedrichs puts forth no evidence to support this. Thus, to prevail under RESPA, the Diedrichs must prove actual damages. *See Catalan*, 629 F.3d at 694.

The Diedrichs argue they suffered damages in the form of loan denials due to bad credit and also suffered emotional distress. As to the loan denials, Natalie Diedrich testified

that she was "unable to take out any loans due to [her] credit being destroyed." (Natalie Diedrich Dep. at 39, Docket # 44-3 at 11.) She explained that she was unable to take out loans due to her having negative credit from the foreclosure action. (*Id.* at 39-40, Docket # 44-3 at 11.) She stated that she could not support her two children with their college education and was "unable to take out any loans to even repair [their] home or do anything since this all started." (*Id.* at 39, 45, Docket # 44-3 at 11-12.)

Additionally, Daniel Diedrich testified that because of Ocwen's actions they could not afford to fix things on their home, had to pay a higher interest rate on a new vehicle because of their credit rating, were unable to help their children pay for college, and were unable to take vacations. (Supplemental Declaration of Briane Pagel ¶ 1, Deposition of Daniel Diedrich ("Daniel Diedrich Dep.") at 15-16, Docket # 49-4 at 5.)

As an initial matter, the Seventh Circuit in *Catalan* stated that "simply being denied a loan that would have to be repaid would not be sufficient by itself to prove damages." 629 F.3d at 695 n.9. Rather, the plaintiffs need to show further damages resulting from a loan denial. *Id.* However, in *Catalan*, even though the plaintiffs seemed to simply allege that they were denied loans, the court allowed the plaintiffs' damages issue to go forward because it was focused on the "threshold step of whether the loans were denied as a result of [the defendant's] actions" and found that there was a dispute of material fact as to whether the negative and erroneous credit information the defendant reported to the credit bureaus caused the plaintiffs to be denied a loan. *Id.*

Unlike in *Catalan*, the Diedrichs have failed to come forth with any evidence that would connect their alleged loan denials to Ocwen's failure to respond to their qualified written request for information. Natalie Diedrich specifically testified that the negative

14

credit reporting was due to the foreclosure action. (Natalie Diedrich Dep. at 39-40, Docket # 44-3 at 11.) Further, a document dated August 22, 2011 from Ocwen shows that as of July 2011, when the parties entered into the loan modification agreement, the Diedrichs' loan with Ocwen was reported as current with the credit bureaus. (June 26, 2014 Blanchard Dep., Exh. D, Docket # 37-1 at 51.) It is true that Natalie Diedrich testified that she contacted Ocwen in January 2012 because she believed that Ocwen was reporting their loan as delinquent in December 2011 and that there was "conflicting reporting," meaning that "[o]ne time it showed that we were delinquent on our monthly, our mortgage payments, and then it also showed again that we weren't," so "it was unclear exactly how they were reporting it." (Declaration of Briane F. Pagel ("Pagel Decl.") ¶ 3, Natalie Diedrich Deposition at 51-54, Docket # 37-3 at 14-15.) However, Ocwen's response to the January 2012 inquiry showed the Diedrichs' loan was reported as current for the entirety of 2011, including in December 2011. (Docket # 37-1 at 53.)

The Diedrichs further argue that Ocwen's failure to provide a response to their qualified written request "meant that the Diedrichs could not assess how to begin to repair their credit." (Pl.'s Resp. to DPFOF ¶ 29.) However, even if Ocwen had properly responded to the Diedrichs' request, they were requesting information regarding litigation fees charged, interest rate charged on the loan, and escrow amounts. It is unclear how this information would have assisted them in assessing how to repair their credit. The request made no mention of Ocwen reporting negative or erroneous credit information to any of the credit bureaus. Thus, the Diedrichs have not shown that their loan denials were caused by Ocwen's failure to respond to their qualified written request for information.

Regarding damages for emotional distress, a party seeking such damages must provide the court with a reasonably detailed explanation of the injuries suffered. Conclusory statements of stress are not sufficient. *See Catalan*, 629 F.3d at 696. For example, in *Catalan*, one plaintiff testified that she sought medical assistance for increased stress during the relevant time period and her medical records reflected that her "house situation" was the cause of her increased stress and she testified that she was nervous, embarrassed, feared she would lose her home, was unable to spend time with her husband and child, was unable to sleep, and experienced headaches. *Id.* The other plaintiff testified that he dealt with his wife crying daily due to the defendant's actions, shouldered increased childcare responsibility because his wife was preoccupied dealing with their mortgage issues, and felt generally useless because he could not resolve the situation and fix his wife's problems. *Id.* The Seventh Circuit reversed the grant of summary judgment on the plaintiffs' emotional distress damages claim because the plaintiffs' testimony was not "conclusory" and "described their emotional turmoil in reasonable detail and explained what they believe[d] to be the source of that turmoil." *Id.*

Here, even looking at the evidence in the light most favorable to the Diedrichs, they have failed to provide evidence constituting a detailed explanation of their emotional distress. Natalie Diedrich testified that she experienced "[f]inancial burden, the whole having the legal issues, the stress of dealing with this every single month." (Natalie Diedrich Dep. at 41, Docket # 37-3 at 11.) When asked to state the basis for her emotional distress damages, Natalie Diedrich testified as follows: "Based on all the things I've been denied since this whole thing started. Based on the stress and everything that this whole entire issue with Ocwen has caused us over the last three years." (*Id.* at 42, Docket # 37-3 at 12.) She

continued: "The basis is everything that Ocwen has put us through over the three years of this lawsuit . . . like I said, the stress and the having to constantly worry about this monthly, and to have an attorney continuously for every day of my life." (*Id.* at 45-46, Docket # 37-3 at 12-13.)

Daniel Diedrich, for his part, testified that Ocwen's actions caused stress, including stress on his relationship with his wife. (Daniel Diedrich Dep. at 15-16, Docket # 49-4 at 5.) Neither Diedrich sought medical or psychiatric assistance as a result of Ocwen's actions. (Natalie Diedrich Dep. at 42, 45, Docket # 37-3 at 12; Daniel Diedrich Dep. at 17-18, Docket # 49-4 at 5-6.) While the Diedrichs need not prove emotional distress with expert testimony or documentary evidence, in comparison to the plaintiffs in *Catalan*, the Diedrichs' testimony that they experienced "stress" and "worry" based on "everything" Ocwen has done is conclusory and vague.

Moreover, even if the Diedrichs' testimonies were sufficiently detailed, they have not established a causal connection between the RESPA violation (Ocwen's failure to respond to the qualified written request for information) and their emotional distress. Specifically, the Diedrichs do not testify that their emotional distress was the result of Ocwen's failure to respond to their qualified written request for information. As discussed above, the Diedrichs' vague testimony was that they experienced stress as a result of "everything" Ocwen has done. Also, it appears from Natalie Diedrichs' testimony that her stress, at least in part, relates to her involvement in the lawsuit itself. While that is understandable, simply having to file suit, however, does not "suffice as a harm warranting actual damages." *Lal v. American Home Servicing, Inc.,* 680 F. Supp. 2d 1218, 1223 (E.D. Cal. 2010); *see also Konieczka v. Wachovia Mortg. Corp.*, 2012 WL 1049910, *3 (N.D. Ill. Mar. 28, 2012). Thus, the

17

Diedrichs' deposition testimony does not, even when taken in the light most favorable to them, provide a basis for actual damages for the violations of § 2605(e)(2)(C).

In summary, even though Ocwen's insufficient response to the Diedrichs' qualified written request for information violated § 2605(e)(2)(C), because the Diedrichs have not put forth any competent evidence of damages, their claim under RESPA fails and summary judgment will be granted in favor of Ocwen.

    3.    *Wis. Stat. § 224.77(1)*

The Diedrichs argue that they are entitled to summary judgment on their claims that Ocwen violated Wis. Stat. §§ 224.77(1)(k), (L), and (m). Pursuant to Wis. Stat. § 224.80(2), a person "aggrieved" by an act by a mortgage broker that is prohibited under Wis. Stat. § 224.77(1) can bring a private cause of action for damages in an amount equal to the greater of the following: (1) twice the amount of the cost of loan origination connected with the transaction, except that the liability under this subdivision may not be less than $100 nor greater than $2,000 for each violation or (2) the actual damages, including any incidental and consequential damages, which the person sustained because of the violation. An "aggrieved party" is defined as one having an interest which is injuriously affected. *SJ Properties Suites v. Specialty Finance Group, LLC*, 864 F. Supp. 2d 776, 797 (E.D. Wis. 2012) (citing *Liebovich v. Minn. Ins. Co.*, 2008 WI 75, ¶¶ 36-37, 310 Wis. 2d 751, 751 N.W.2d 764).

Wis. Stat. § 224.77(1)(k) prohibits mortgage bankers, mortgage loan originators, and mortgage brokers from violating any federal or state statute, rule, or regulation that relates to practices applicable to them. Wis. Stat. § 224.77(1)(L) prohibits them from engaging in conduct that violates a standard of professional behavior which, through professional experience, has become established for them. And Wis. Stat. § 224.77(1)(m) prohibits them

18

from engaging in conduct that constitutes improper, fraudulent, or dishonest dealing. For the reasons explained above, the Diedrichs have adduced no evidence showing that they were "aggrieved" by Ocwen's failure to properly respond to their qualified written request for information. Without evidence of damages, the Diedrichs' claims under Wis. Stat. § 224.77(1) fail and summary judgment is granted in favor of Ocwen.

## CONCLUSION

Both the Diedrichs and Ocwen have moved for summary judgment. As to the Diedrichs' Wis. Stat. § 138.052(7) claim, because the evidence does not establish that interest was imposed that exceeded the contract rate of 2%, Ocwen is entitled to summary judgment on this claim. As to the Diedrichs' 12 U.S.C. § 2605(e)(2) claim, I find, as a matter of law, that Ocwen violated RESPA by failing to properly respond to the Diedrichs' qualified written request for information. However, because the Diedrichs have failed to put forth evidence of damages stemming from the violation, Ocwen is entitled to summary judgment on this claim. Finally, as to the Wis. Stat. § 224.77(1) claim, because the Diedrichs have failed to establish damages, they cannot show they were "aggrieved" under the statute and Ocwen is entitled to summary judgment on this claim as well.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the plaintiffs' motion for summary judgment (Docket # 36) is **DENIED** and the defendant's motion for summary judgment (Docket # 39) is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 24th day of April, 2015.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge